UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: 20-CR-211 (KBJ) |
| | : | |
| v. | : | |
| | : | |
| WILLIAM ROBINSON, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing for William Robinson (hereinafter "the defendant", "Robinson," or "Defendant Robinson"). Based on the arguments set forth below, and those that may be made at the sentencing hearing, the government respectfully requests that the Court sentence the defendant to 40 months of incarceration, to be followed by 3 years of supervised release. The government also respectfully requests that this sentence be run consecutive to any other sentence.

**I.    Factual and Procedural Background**

In March 2017, the defendant incorporated Vulcan Network & Data Security, LLC ("Vulcan") to effectuate his fraud scheme. From April 2017 through September 2019, the defendant consciously decided on 13 separate occasions to steal money from his former employer ("Company A"), a non-profit organization in the District of Columbia and elsewhere in the United States that advocates for policies related to the climate and safe food and drinking water. Defendant Robinson facilitated a contract for Vulcan to provide web security services to Company A. He then exploited his role as the organization's Chief Technology Officer to directly submit

1

to the finance department invoices he created on behalf of Vulcan requesting payment by Company A for services not provided. The amounts of the invoices and corresponding payment by the non-profit organization ranged from $11,670 to $29,500. Company A paid the invoices in full,[1] totaling $282,670.[2] The defendant received the entirety of these funds and spent the money on personal expenses.

In the course of Defendant Robinson's role as Chief Technology Officer, Company A began to realize he was unable to fully perform the position's responsibilities. As of approximately spring of 2018, Company A began removing functions from the defendant's supervision and reassigning them to other teams within the organization. The defendant gave himself access to the email accounts of executive staff members of Company A and therefore is believed to have been aware that Company A was planning to terminate him. The last check Company A issued to Vulcan was written and cashed on the same day: October 11, 2019. The

---

[1] The amount of one invoice is unknown, but Company A's payment to Vulcan for this invoice was $29,500. All other invoices had an amount that matched the amount of the corresponding check Company A paid to Vulcan.

[2] The check amounts were as follows:
1. $24,500 (dated August 10, 2017);
2. $20,000 (dated August 4, 2017);
3. $29,500 (dated October 5, 2017);
4. $22,500 (dated January 8, 2018);
5. $17,000 (dated March 27, 2018);
6. $22,500 (dated May 4, 2018);
7. $22,500 (dated June 29, 2018);
8. $11,670 (dated August 17, 2018);
9. $22,500 (dated November 9, 2018);
10. $22,500 (dated January 25, 2019);
11. $22,500 (dated March 28, 2019);
12. $22,500 (dated August 9, 2019); and
13. $22,500 (dated October 11, 2019).

defendant received that check after offering to pay an employee of Company A to deliver it to him in Springfield, Virginia.  Six days later, on October 17, 2019, the defendant was terminated.

Defendant Robinson's fraud scheme was later discovered as the result of an audit.  This finding was communicated by a human resources employee of Company A to a then-attorney for the defendant on November 6, 2019.  Two days later, on November 8, 2019, the defendant emailed the human resources employee, stating that he consulted a criminal attorney "and was informed that at a minimum that what I did was unethical but that a jury could possibly convict me of a criminal offense. Based on this and [Company A] agreeing not to pursue criminal charges against me, I will pay the full amount back."  The defendant wrote that he agreed to pay $70,500 by the end of each year from 2020-2023.  The defendant also wrote, "I did not profit from this business and set up this business so that those in the Bahamas that I met that specialized in security could do the work for [Company A]."

On October 6, 2020, after reaching a plea agreement, the government filed an information charging the defendant with one count of Interstate Transportation of Stolen Property, in violation of 18 U.S.C. § 2314.  On December 1, 2020, the defendant entered a guilty plea.

## II.     Government's Sentencing Recommendation

The government recommends a sentence of 40 months of incarceration, which is below the midpoint of the applicable Guidelines range, followed by three years of supervised release.  Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence to criminal conduct.

Company A has not provided a victim impact statement to the government at this time.

### a. Legal Standards

For a violation of 18 U.S.C. § 2314, the maximum sentence that can be imposed is ten years of imprisonment and a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(2)-(3),(d). The defendant also may be subject to a three-year term of supervised release, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and a mandatory special assessment of $100. Finally, the defendant may be subject to applicable interest and penalties on fines and restitution not timely made.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Gall v. United States, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)). As one member of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence."

United States v. Doe, 413 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.). "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

b. **Analysis**

At the outset, the government agrees with the calculation in the draft Pre-Sentence Investigation Report[3] that the applicable sentencing guidelines range, pursuant to the United States Sentencing Guidelines, *Guidelines Manual* (2018) ("Sentencing Guidelines," "Guidelines" or

---

[3] To timely file a memorandum in aid of sentencing, this memorandum is being filed prior to the filing of the final Presentence Investigation Report. Accordingly, all citations to the PSR in this sentencing memo are to the draft Presentence Investigation Report dated January 26, 2021 [ECF No. 10].

"U.S.S.G."), is 37-46 months of incarceration.[4]

The parties and the draft presentence report writer agree that the defendant's offense level under the U.S. Sentencing Guidelines ("USSG") is 19. The base offense level for interstate transportation of stolen property is six pursuant to USSG §2B1.1. Because the defendant embezzled $282,670, the base offense is increased twelve levels pursuant to USSG §2B1.1(b)(1)(G). A two-level increase is warranted because the defendant's scheme involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means pursuant to USSG §2B1.1(b)(10). An additional two-level increase is warranted because the defendant abused his position of trust at the non-profit organization in a manner that significantly facilitated the commission or concealment of the offense pursuant to USSG §3B1.3. The adjusted offense level of 22 is then decreased by three points because of the defendant's timely acceptance of responsibility pursuant to USSG §3E1.1.

---

[4] At the time the plea was entered, the parties had estimated the defendant's Criminal History Category to be II rather than III, leading to an estimated Guidelines range of 33 to 41 months of incarceration. The estimated calculation at the time of the plea did not account for the fact that the defendant was still on probation for his Second Degree Murder conviction in Virginia in 1997. Under USSG §4A1.1(d), this adds two points, making the total number of points related to that case five.

The defendant may also receive a sixth point for his Reckless Driving conviction. See Draft PSR ¶ 41. According to USSG §4A1.2(c)(1), this conviction would be counted "only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." The defendant's sentence was 90 days of incarceration, with 86 days suspended. Draft PSR ¶ 41. Therefore, it undersigned counsel's understanding that this counts as one criminal history point. See USSG §4A1.1(c). At the time of writing, it is unclear whether the draft PSR counts the conviction or not. It lists 0 points for the offense in ¶ 41 but provides an overall calculation of four criminal history points in ¶ 42. Whether or not the defendant's Reckless Driving conviction is counted as one point, the defendant is in Criminal History Category III.

Based on a Total Offense Level of 19 and Criminal History Category of III, the recommended Guidelines range is 37 months to 46 months of incarceration. Draft PSR ¶ 91. The recommended fine range is $10,000 to $100,000. Draft PSR ¶ 108.

### 1. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

The defendant's fraud upon a non-profit organization was not an isolated incident. It was not a two-time mistake. Instead, over the course of about two and a half years, while earning a salary between $135,000 and $190,549.92, the defendant decided to steal from his employer thirteen separate times. As the organization's Chief Technology Officer, he abused his position of trust with the organization by arranging an illegitimate contract with his own shell company, and submitting invoices that did not receive the same level of scrutiny as they would have from someone lower in the department. There is no reason to believe that the defendant would have stopped stealing from the organization but for his termination and the organization's discovery of the fraud shortly thereafter.

Embezzling money from a non-profit organization is a particularly serious crime, especially when the scheme spanned over two years. A sentence of 40 months' imprisonment would reflect the nature, circumstances, and seriousness of the offense.

### 2. Robinson's History and Characteristics

The defendant has spent the majority of his adult life incarcerated after being convicted of Second Degree Murder in 1997 at age 17. He was incarcerated from January 1997 until January 2011. Draft PSR ¶¶ 70, 83. To his credit, while incarcerated, the defendant obtained a GED, associate's degree, and bachelor's degree. Draft PSR ¶¶ 74-75. Also to his credit, the defendant taught himself web development, cybersecurity, network, and database administration from

7

December 2011 to May 2012.  Draft PSR ¶ 80.  He then received a great employment opportunity – a rarity for someone with his criminal history[5] – when Company A hired him as a web developer in 2012.  His starting annual salary was $60,000.  His opportunities continued.  He was promoted multiple times and ultimately attained the position of Chief Technology Officer in 2015.  According to Company A, the defendant did not have all of the requisite skills for the Chief Technology Officer position, but he was selected because of his "can-do attitude" and willingness and ability to figure out the things he did not know and work with those needed to get the job done.  At the time of his termination in late 2019, his salary was approximately $190,000.[6]

The defendant's path after release from prison was a great success, until he decided to turn his success at Company A into a criminal scheme.  When asked what motivated him to commit this offense, the defendant told the draft PSR writer that "he was not getting paid at or near other executives in similar positions, and the defendant felt it was a case of racial injustice."  Draft PSR ¶ 24.  The defendant also said that his colleagues were not performing at the same level as he was.  Id.  However, Company A reported terminating the defendant for poor performance.  Regardless, Defendant Robinson's perception of his performance or salary measured against other executives offers no justification for stealing hundreds of thousands of dollars from his employer, a non-profit organization.  If Defendant Robinson had concerns about his performance or salary, he could have addressed them through lawful means.  The defendant acknowledged this to the draft PSR author, noting that "he should have given it time and sought out additional employment, rather than engage

---

[5] Based on the defendant's comments that his wife threatened to tell his employer about his felony conviction, see Draft PSR ¶ 59, it appears that Company A was unaware of this prior conviction.

[6] The draft PSR at ¶ 79 lists an annual salary of $189,000.  Records of Company A list a salary of $190,549.92, with an effective date of January 1, 2019.

8

in criminal conduct." Draft PSR ¶ 24. The defendant also attributed his criminal conduct to his then-wife's lifestyle. Draft PSR ¶ 59.

A forty-month sentence is appropriate for several reasons. First, although the plea was to a particular instance of interstate transportation of stolen property, the defendant's fraud scheme went on for over two years and involved thirteen instances of submitting fraudulent invoices and receiving the resultant payments. Second, the victim was a non-profit organization who had placed trust in the defendant. The government has weighed these factors against the defendant's acceptance of responsibility. Once the government made the defendant aware of its criminal case against him, the defendant agreed to plead guilty almost immediately.

The defendant continues to have health issues related to a 2019 motorcycle accident and receives numerous medications for those injuries and other conditions. Draft PSR ¶¶ 63-65.

### 3. The Need to Promote Respect for the Law, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

Although the defendant has expressed remorse for this criminal conduct and accepted responsibility as early as possible, the sentence must promote respect for the law and deter the defendant and others from committing similar crimes. At the time he committed this offense, the defendant was still on probation for a Second Degree Murder Conviction in 1997. See Draft PSR ¶ 38. A 40-month sentence would promote respect for the law and deter the defendant and others from engaging in this type of conduct.

### 4. Other Sentencing Factors

A sentence of 40 months of incarceration would be consistent with the other Section 3553(a) factors. Because the government's recommendation is within the Sentencing Guidelines

range, it is in the "heartland" of sentences imposed for this particular offense and therefore accomplishes the goal of avoiding unwarranted sentence disparities. See U.S.S.G. ch 1, pt. A, cmnt 4(b). This sentence would provide just punishment for the offense in light of the defendant's history and actions in this case.

### III.    Restitution and Forfeiture

The defendant agreed to the entry of a forfeiture money judgment against him in the amount of $282,670. The Court signed the consent order of forfeiture on December 1, 2020. See ECF No. 9.

In addition to forfeiture, the defendant also should be ordered to pay restitution. "The Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, requires a district court to order a defendant to make restitution to a victim of certain specified offenses." United States v. Thomsen, 830 F.3d 1049, 1065 (9th Cir. 2016) (internal quotations and citations omitted). The offenses subject to the MVRA are listed in section 3663A(c). See 18 U.S.C. § 3663A(c). They include "any offense that is . . . an offense against property under this title . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The crime of interstate transportation of stolen property is "an offense against property under" Title 18 and thus falls under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Restitution is owed to Company A in the amount of $282,670.

### IV.    Special Conditions of the Sentence and Supervised Release

The government agrees with the special conditions proposed by the probation office in the draft PSR. See Draft PSR ¶ 100. This includes a restitution obligation and alcohol abuse

treatment.  Id.  Additionally, the government requests that the defendant be ordered to undergo a mental health assessment and any recommended treatment.  See Draft PSR ¶ 69.

## V.     Conclusion

WHEREFORE, for the foregoing reasons, the government respectfully requests that the Court sentence the defendant to 40 months of incarceration.

                        Respectfully submitted,

                        MICHAEL R. SHERWIN
                        ACTING UNITED STATES ATTORNEY
                        D.C. Bar No. 4444188

By:   /s/ *Christine M. Macey*
        CHRISTINE M. MACEY
        D.C. Bar No. 1010730
        Assistant United States Attorney
        Fraud Section
        555 Fourth Street, N.W., Room 5243
        Washington, D.C. 20530
        (202) 252-7058
        Christine.Macey@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2021, a copy of this motion was sent via electronic case filing to counsel for the defendant.

                        /s/ *Christine M. Macey*
                        Christine M. Macey
                        Assistant United States Attorney